UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

           -against-

JUAN RAMIREZ,

                        Defendant.

**ORDER**

98 Cr. 438 (PGG) (SDA)

PAUL G. GARDEPHE, U.S.D.J.:

On August 10, 2021, Defendant Juan Ramirez filed a motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). (Mot. (Dkt. No. 451)) The Government opposes Ramirez's application. (Govt. Opp. (Dkt. No. 454))

For the reasons stated below, Ramirez's motion will be granted.

## BACKGROUND

### I.    CHARGES AND TRIAL

Between 1992 and 1998, Juan Ramirez was the leader of the 165th Street Organization, a violent gang that operated in the Bronx (the "gang" or the "Organization"). (PSR ¶¶ 53-54, 78) Members of the Organization engaged in widespread car theft; narcotics trafficking; armed robberies of individuals, businesses, and other drug dealers in the Bronx, New Jersey, and Pennsylvania; and kidnapped, assaulted, and murdered rival drug dealers. (Id. ¶ 52)

In a twenty-five count Superseding Indictment, Ramirez was charged with twenty-four offenses relating to his role as the leader of the Organization. (S17 Indictment (Dkt. No. 160)) In October 2000, Ramirez proceeded to trial before Judge Robert Carter along with two of his thirteen co-defendants. The evidence at trial showed that Ramirez committed the following offenses, among others:

▪ *Murder of Felix Rodriguez*:  On March 10, 1994, Ramirez ordered the murder of Felix Rodriguez, a rival drug dealer, over a feud that arose after Ramirez stole Rodriguez's car. When Ramirez spotted Rodriguez sitting in a vehicle parked in front of a bar, Ramirez directed gang member Manuel Gonzalez to shoot Rodriguez.  Gonzalez then approached Rodriguez's vehicle and shot Rodriguez four times at close range, killing him.  (<u>Id.</u> ¶¶ 86-87)

▪ *Armed Robbery, Kidnapping, and Murder of Francisco Soto*:  In February 1995, Ramirez, along with Manuel Gonzalez, Jose Rojas-Vargas, and other gang members developed a plan to rob and kill Francisco Soto, whom they knew to be in possession of 125 kilograms of cocaine.  Ramirez and other gang members carried out the robbery on March 15, 1995, dressed as police officers and carrying handcuffs and firearms.  They found Soto outside of a New Jersey auto body shop, sitting inside a vehicle with the 125 kilograms of cocaine.  Soto was forced out of the vehicle at gunpoint by Ramirez and his crew, handcuffed, put into the back of a van, and driven to another location in the Bronx.  While Soto was transported to the Bronx, Soto's car and the stolen cocaine were driven to a pre-arranged meeting place where the cocaine was divided up.  Soto was taken to an isolated area of Orchard Beach in the Bronx, where Jose Rojas-Vargas and Manuel Gonzalez walked Soto into a wooded area, and shot and killed him.  (PSR ¶¶ 93-108)

▪ *Assault of "Papo"*:  On June 27, 1995, Ramirez and other gang members traveled to Reading, Pennsylvania to collect a drug debt from a drug dealer who used the name "Papo." When Ramirez and the others found Papo, they confronted him and Ramirez instructed Manuel Gonzalez to shoot Papo.  Gonzalez shot Papo twice in the leg, after which the group fled the area.  Ramirez, Gonzalez, and several others were apprehended by Pennsylvania police as they were attempting to flee.  (<u>Id.</u> ¶¶ 116-18)

- *Armed Robbery of Alcides Martes*:  In the fall of 1994, Ramirez, together with his brother Luis Ramirez ("Luis"), Beverlyn Santiago, Damon Rodriguez, and Ernesto Martinez, robbed another drug dealer, Alcides Martes, of ten kilograms of cocaine.  Ramirez and the other gang members carried out the robbery dressed as police officers and were equipped with handcuffs and firearms.  They forced Martes, together with Martes' wife, his two children, and two of Martes' neighbors, into Martes' apartment in the Bronx by hitting Martes in the head with a gun.  While Ramirez searched the apartment for cocaine, Luis and Martinez stood guard over Martes, who was handcuffed and held at gunpoint.  Once Ramirez found the ten kilograms of cocaine, Ramirez and the others fled the apartment and divided the cocaine among themselves. (Id. ¶¶ 79-82)

- *Narcotics Trafficking*:  Ramirez and other gang members possessed and distributed large amounts of cocaine, crack cocaine, and heroin in the Bronx and in Reading, Pennsylvania.  Ramirez and others obtained powder cocaine through purchases or robberies, and Defendant Jesus Salcedo would convert a portion into crack cocaine.  The crack cocaine was sold on the street by either (1) individuals addicted to crack cocaine, who sold the drug in exchange for small quantities for personal use; or (2) juveniles, whom Ramirez "knew would receive little or no punishment for their activities."  (Id. ¶¶ 109-10)  Ramirez managed several locations where the Organization sold drugs, including a location in the Bronx and another in Reading, Pennsylvania.  He also served as "protection" for other drug sale locations, meaning that when he "saw someone selling drugs on his spot, or believed that someone was stealing money and/or drugs from him, on several occasions, in full view of the neighborhood, he would beat the offender with an aluminum baseball bat."  (Id. ¶¶ 111, 113)

- *Automobile Theft*:  Between the fall of 1992 and spring of 1998, Ramirez and other gang members "stole, stripped, and sold stolen autos and automobile parts, including airbags," which were valued at between $40,000 and $70,000.  (PSR ¶ 77)

After a seven-week trial, the jury found Juan Ramirez guilty on eighteen of the twenty-four counts in which he was charged.[1]  The jury's findings are as follows:

| Count | Statute(s) | Charge | Act | Verdict |
|---|---|---|---|---|
| 1 | 18 U.S.C. §§ 1961, 1962(c) | Racketeering | Participation in twelve racketeering acts as part of the 165th Street Organization from 1992 to 1998[2] | Guilty |
| 2 | 18 U.S.C. § 1962(d) | Racketeering Conspiracy | Conspiracy to participate, directly and indirectly, in the twelve racketeering acts charged in Count One | Guilty |
| *3* | *18 U.S.C. §§ 2, 1959(a)(5)* | *Attempted Murder in Aid of Racketeering* | *January 7, 1995 attempted murder of "Victim 1"* | *No verdict – mistrial declared* |

[1] The other two defendants at trial — Luis Ramirez and Shirley Calcano – were also found guilty on multiple counts.  Luis Ramirez was found guilty on nine of the eleven counts with which he was charged, and Shirley Calcano was found guilty on both of the counts with which she was charged.  (Dec. 7, 2000 Trial Tr. (Dkt. No. 444-25) at 10-17)

[2] The twelve racketeering "acts" charged in the Superseding Indictment are as follows: (1) attempted murder of "Victim 1" on January 7, 1995 in the Bronx; (2) conspiracy to rob Francisco Soto and robbery and kidnapping of Francisco Soto on March 15, 1995; (3) murder of Francisco Soto on March 15, 1995; (4) possession with intent to distribute five kilograms and more of cocaine on March 15, 1995; (5) possession with intent to distribute 50 grams and more of crack cocaine between 1994 and June 27, 1995, and possession with intent to distribute one kilogram and more of heroin from March 1995 to June 27, 1995; (6) attempted murder of "Papo" on June 27, 1995; (7) conspiracy to rob Alcides Martes and other individuals, and robbery of Alcides Martes and other individuals in late 1994; (8) possession with intent to distribute five kilograms and more of cocaine in late 1994; (9) attempt to possess with intent to distribute three kilograms and more of cocaine on February 21, 1997; (10) conspiracy to distribute and possess with intent to distribute 50 grams and more of crack cocaine, one kilogram and more of heroin, and five kilograms and more of cocaine from 1994 through May 1998; (11) conspiracy to murder Felix Rodriguez and murder of Felix Rodriguez on March 10, 1994; and (12) interstate transportation of stolen goods, including stolen airbags and other stolen automobile parts, from the fall of 1992 through the spring of 1998.  (S17 Indictment (Dkt. No. 160) ¶¶ 7-18)  The Government voluntarily dismissed act six during trial.  (See Nov. 15, 2000 Trial Tr. (Dkt. No. 444-14) at 4-5)

| 4 | 18 U.S.C. §§ 2, 1959(a)(1) | Kidnapping in Aid of Racketeering | March 15, 1995 kidnapping of Francisco Soto | Guilty |
|---|---|---|---|---|
| 5 | 18 U.S.C. §§ 2, 1959(a)(1) | Murder in Aid of Racketeering | March 15, 1995 murder of Francisco Soto | Guilty |
| *6* | *18 U.S.C. § 1959(a)(5)* | *Conspiracy to Murder in Aid of Racketeering* | *June 1995 conspiracy to murder "Papo"* | *[N/A]* |
| *7* | *18 U.S.C. §§ 2, 1959(a)(5)* | *Attempted Murder in Aid of Racketeering* | *June 27, 1995 attempted murder of "Papo"* | *[N/A]* |
| 8 | 18 U.S.C. §§ 2, 1959(a)(3) | Assault in Aid of Racketeering | June 27, 1995 assault of "Papo" with a firearm | Guilty |
| 9 | 18 U.S.C. §§ 2, 1952 | Interstate Travel in Aid of Racketeering | March 15, 1995 robbery and murder of Francisco Soto | Guilty |
| 10 | 18 U.S.C. §§ 2, 1952 | Interstate Travel in Aid of Racketeering | June 27, 1995 assault of "Papo" with a firearm | Guilty |
| 11 | 18 U.S.C. § 1951 | Conspiracy to interfere with commerce by threats or violence | Conspiracy to rob Francisco Soto at gunpoint between February 1995 and March 1995 | Guilty |
| 12 | 18 U.S.C. §§ 2, 1951 | Interference with commerce by threats or violence | March 15, 1995 robbery of Francisco Soto at gunpoint | Guilty |
| 13 | 18 U.S.C. § 1951 | Conspiracy to interfere with commerce by threats or violence | Conspiracy to rob Alcides Martes and other individuals of narcotics or the proceeds of narcotics sales at gunpoint in late 1994 | Guilty |
| 14 | 18 U.S.C. §§ 2, 1951 | Interference with commerce by threats or violence | Robbery of Alcides Martes and other individuals of narcotics or the proceeds of narcotics sales at gunpoint in late 1994 | Guilty |
| 15 | 21 U.S.C. § 846 | Narcotics Conspiracy | Conspiracy to distribute and possess with intent to distribute five kilograms and more of cocaine, 50 grams and more of cocaine base, and one kilogram and more of heroin between 1994 and May 1998, in violation of 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(A) | Guilty |
| 16 | 18 U.S.C. §§ 2, 1201 | Kidnapping Resulting in Death | March 15, 1995 kidnapping of Francisco Soto | Guilty |
| *17* | *18 U.S.C. § 1951* | *Conspiracy to interfere with* | *May 12, 1994 conspiracy to rob the Highbridge Woodycrest* | *Acquitted* |

| | | *commerce by threats or violence* | *Center, an AIDS clinic in the Bronx* | |
|---|---|---|---|---|
| *18* | *18 U.S.C. §§ 2, 1951* | *Interference with commerce by threats or violence* | *May 12, 1994 robbery of the Highbridge Woodycrest Center* | *Acquitted* |
| 19 | 18 U.S.C. §§ 2, 2314 | Interstate Transportation of Stolen Property | Theft and sale of stolen autos and automobile parts between the fall of 1992 and spring of 1998 | Guilty |
| 21 | 18 U.S.C. §§ 2, 924(c) | Use/Carrying of a Firearm in Relation to a Crime of Violence or Drug Trafficking Crime | January 7, 1995 use and carrying of a firearm in connection with attempted murder of "Victim 1" | Guilty |
| 22 | 18 U.S.C. § 924(c) | Use/Carrying of a Firearm in Relation to a Crime of Violence or Drug Trafficking Crime | March 15, 1995 use and carrying of firearms in connection with the robbery, kidnapping and murder of Francisco Soto | Guilty |
| 23 | 18 U.S.C. §§ 2, 924(c) | Use/Carrying of a Firearm in Relation to a Crime of Violence or Drug Trafficking Crime | Use and carrying of firearms in connection with the robbery of Alcides Martes and other individuals at gunpoint in late 1994 | Guilty |
| *24* | *18 U.S.C. §§ 2, 924(c)* | *Use/Carrying of a Firearm in Relation to a Crime of Violence or Drug Trafficking Crime* | *May 12, 1994 use and carrying of a firearm in connection with the robbery of the Highbridge Woodycrest Center* | *Acquitted* |
| 25 | 18 U.S.C. § 922(g) | Possession of a Firearm by a Convicted Felon | May 14, 1998 possession of a firearm despite prior felony conviction | Guilty |

(See Dec. 7, 2000 Trial Tr. (Dkt. No. 444-25) at 10-17)[3]

Using the 2000 edition of the Sentencing Guidelines, the Probation Department

determined that Ramirez's offense level is 43, his criminal history score is 23, and his Criminal

_____

[3] The page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

Ramirez was not charged in Count Twenty.  (See S17 Indictment (Dkt. No. 160) ¶ 49)  The Government voluntarily dismissed Counts Six and Seven during trial.  (See Nov. 15, 2000 Trial Tr. (Dkt. No. 444-14) at 4-5)

History Category is VI, yielding a Guidelines range of life imprisonment.  (PSR ¶¶ 212, 250, 284)  Several statutory mandatory minimum sentences also applied:  ten years' imprisonment on Count Fifteen, pursuant to 21 U.S.C. § 846; life imprisonment on Count Sixteen, pursuant to 18 U.S.C. § 1201; a consecutive five-year term of imprisonment on Count Twenty-One, pursuant to 18 U.S.C. § 924(c); and consecutive twenty-year terms of imprisonment on each of Counts Twenty-Two and Twenty-Three, pursuant to 18 U.S.C. § 924(c).  (Id. ¶¶ 280, 281, 283)  Accordingly, Ramirez faced a mandatory minimum sentence of life plus 45 years' imprisonment, which is the sentence Judge Robert Carter imposed on April 22, 2002.[4]  (Id. ¶ 284; Judgment (Dkt. No. 452-5) at 2-4)  To date, Ramirez has served twenty-three years of that sentence.  (Def. Br. (Dkt. No. 452) at 29)

## II.    APPEAL AND § 2255 PETITIONS

Ramirez appealed his sentence the same day it was imposed.  (Notice of Appeal (Dkt. No. 231))  On December 17, 2003, the Second Circuit issued a summary order dismissing Ramirez's appeal, as well as appeals filed by co-defendants Luis Ramirez and Shirley Calcano.  See United States v. Martinez, 83 F. App'x 384 (2d Cir. 2003) (summary order), cert. granted, judgment vacated sub nom. Calcano v. United States, 543 U.S. 801 (2004).[5]

---

[4]  Judge Carter imposed sentences of life imprisonment on each of Counts One, Two, Four, Five, Fifteen, and Sixteen, to run concurrently; twenty years' imprisonment on each of Counts Eight through Fourteen, to run concurrently; ten years' imprisonment on each of Counts Nineteen and Twenty-Five, to run concurrently; five years' imprisonment on Count Twenty-One, to run consecutively; and twenty years' imprisonment on each of Counts Twenty-Two and Twenty-Three, to run consecutively.  (Judgment (Dkt. No. 452-5) at 4)

[5]  On October 4, 2004, the Supreme Court vacated the Second Circuit's December 17, 2003 order as to Calcano and remanded "for further consideration in light of Crawford v. Washington, 541 U.S. 36 . . . (2004)."  Calcano v. United States, 543 U.S. 801 (2004).  The Supreme Court denied Ramirez's petition for a writ of certiorari.  See Ramirez v. United States, 543 U.S. 849 (2004).

On April 27, 2005, Ramirez filed a pro se petition pursuant to 28 U.S.C. § 2255 to vacate his sentence.  (Case No. 05 Civ. 4179, Dkt. No. 1)  In March 2009, counsel was appointed to represent Ramirez in connection with his Section 2255 petition.  (Dkt. No. 309)

On November 24, 2009, the instant case was reassigned to this Court, and Ramirez's Section 2255 petition was reassigned to Judge Scheindlin.

On July 31, 2012, Judge Scheindlin issued an order granting Ramirez's petition to the extent that it sought reinstatement of his appeal.  (Order (Case No. 05 Civ. 4179, Dkt. No. 21) at 5)  Judge Scheindlin concluded that Ramirez had been "without counsel at a critical stage in his appeal," because his lawyer failed to respond to the Second Circuit's order permitting briefing on the applicability of Crawford v. Washington, 541 U.S. 36 (2004) to his case.  (Id. at 18-25)  Judge Sheindlin otherwise denied the petition.   (Id. at 29)

On August 6, 2013, the Second Circuit issued an order reinstating Ramirez's appeal to allow Ramirez to address the applicability of Crawford.  (Dkt. No. 350)  The Second Circuit dismissed Ramirez's appeal on October 28, 2014.  (Dkt. No. 370)

On June 26, 2016, Ramirez sought leave to file a successive Section 2255 petition in light of Johnson v. United States, 135 S. Ct. 2551 (2015).  (Dkt. No. 400-1)  In July 2016, the Second Circuit stayed the petition pending decisions in United States v. Barrett, No. 14-2641 (2d Cir.) and United States v. Hill, No. 14-3872 (2d Cir.).  (Order, Ramirez v. United States, No. 16-2409 (2d Cir. July 26, 2016) (Dkt. No. 11))  On August 26, 2020, following the Supreme Court's decision in United States v. Davis, 139 S. Ct. 2319 (2019), the Second Circuit granted Ramirez's motion to file a successive Section 2255 petition pursuant to Johnson and Davis.  (Dkt. No. 400)

Ramirez's Section 2255 petition was reassigned to this Court on August 28, 2020. On April 6, 2021, this Court referred Ramirez's petition to Magistrate Judge Aaron. (Dkt. No. 441) The petition remains pending.

## III.    MOTION FOR COMPASSIONATE RELEASE

On August 10, 2021, Ramirez filed a motion for a reduction in sentence pursuant to 18 U.S.C. § 3582(c)(2), in which he contends that he is entitled to compassionate release because he suffers from advanced pancreatic and liver cancer. (Def. Br. (Dkt. No. 452) at 12 (citing Ramirez Medical Records, Def. Br. Ex. B (submitted under seal)) Ramirez received his cancer diagnosis in July 2021. The Bureau of Prisons ("BOP") physicians treating Ramirez have described his prognosis as "'grim with not much time left,'" and "have advised him that there is nothing that they can do for him medically." (Id. at 12-13 (citing July 28, 2021 BOP email, Def. Br. Ex. C (Dkt. No. 452-3)) Ramirez asserts that, given his "fragile medical condition," the COVID-19 pandemic presents a grave threat to his health, and "even the mildest or even asymptomatic case of COVID-19 could prove fatal." (Id. at 13) If released, he plans to live with his brother in the Bronx, where his family will care and provide for him. (Id. at 39 n.14, 48)

Ramirez is currently serving his sentence at the Federal Medical Center in Butner, North Carolina ("FMC-Butner"). (Id. at 13 n.3) On August 24, 2021, defense counsel submitted a letter advising that, "[a]lthough FMC Butner is a BOP medical facility, it apparently in no way resembles any hospital in New York City in which Mr. Ramirez might receive treatment for his Stage 4 pancreatic cancer." (Aug. 24, 2021 Def. Ltr. (Dkt. No. 457)) Defense counsel reports that Ramirez was quarantined with his cellmate for eighteen days upon arrival at FMC-Butner, during which time "[n]o one from the BOP changed his laundry"; that Ramirez is receiving "the same standard-issue prison meals that all BOP inmates receive," which is inadequate for "any

individual batting Stage 4 pancreatic cancer" and receiving chemotherapy treatment; that he is confined to his cell except when receiving chemotherapy treatment or seeing a physician; that "the only water available for him to drink is supplied by the combination sink/toilet in his cell, and he is not provided with any hot or cold water"; and that his bed is "not a hospital-type bed but instead is . . . a standard-issue BOP metal-frame bed with a thin, standard-issue BOP mattress. . . ." (Id. at 1-2)  Ramirez asserts that these "conditions are substandard and therefore are relevant to this Court's evaluation of Mr. Ramirez's sentence reduction motion." (Id.)

On September 1, 2021, defense counsel submitted a letter advising that Ramirez underwent emergency surgery to remove a "dangerous bowel obstruction." (Sept. 1, 2021 Def. Ltr. (Dkt. No. 458))  Ramirez was "fitted with [a] colostomy bag" during surgery and then "returned alone to a regular cell and provided with two additional colostomy bags (but no instruction on how to use them)."  Counsel reports that "[o]n at least one occasion the colostomy bag leaked and its contents settled on Mr. Ramirez's body," and that Ramirez was forced to "use his own clothing to clean himself." (Id. at 2)  Counsel states that he is "hesitant to second-guess or characterize the medical treatment the BOP has thus far provided to Mr. Ramirez," but feels "obliged to advise this Court of [Ramirez's] deterioration." (Id.)

## DISCUSSION

## I.   LEGAL STANDARD

The compassionate release statute – 18 U.S.C. § 3582(c)(1)(A) – provides that a court may

> upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant . . . reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction. . . .

18 U.S.C. § 3582(c)(1)(A).

Pursuant to this statute, a defendant seeking compassionate release must "fully exhaust[] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or "30 days [must have lapsed] from the receipt of such a request by the warden of the defendant's facility. . . ."  Id.

## II.   ANALYSIS

### A.   Exhaustion of Administrative Remedies

Ramirez submitted a request for a reduction in sentence to the warden of his previous facility – the United States Penitentiary in Pollock, Louisiana ("USP Pollock") – on July 27, 2021.  (Def. Br. (Dkt. No. 452) at 24-25 (citing Def. Br. Ex. H (Dkt. No. 452-8))  The Government argues that Ramirez has not exhausted his administrative remedies because, at the time it submitted its opposition, 30 days had not passed since Ramirez submitted his request to the warden.  (See Govt. Opp. (Dkt. No. 454) at 23)  The 30-day exhaustion period expired on August 26, 2021, however.  Accordingly, the Government's argument is now moot.  The Court concludes that Ramirez has satisfied the exhaustion requirement.  See 18 U.S.C. § 3582(c)(1)(A).

### B.   "Extraordinary and Compelling Reasons"

Congress tasked the Sentencing Commission with providing guidance to courts regarding the application of the compassionate release statute.  See 28 U.S.C. § 994(t) ("The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."); see also United States v. Hernandez, 451 F. Supp. 3d 301, 303 (S.D.N.Y. 2020); United States v. Ebbers, 432 F. Supp. 3d 421, 427 (S.D.N.Y. 2020).  The

Commission's policy statement and commentary concerning § 3582(c)(1)(A) are found in U.S. Sentencing Guideline § 1B1.13, which states that a court may reduce a sentence for "extraordinary and compelling reasons," including where the defendant is "suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory)" such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia."  U.S.S.G. § 1B1.13(1)(A) & cmt. n.1(A)(i). [6]

Ramirez argues that his diagnosis of advanced pancreatic and liver cancer – the prognosis for which is "grim with little time left," according to BOP physicians – constitutes extraordinary and compelling circumstances.  (Def. Br. (Dkt. No. 452) at 28 (citing July 28, 2021 BOP email, Def. Br. Ex. C (Dkt. No. 452-3))  He also asserts that the COVID-19 pandemic presents a particularly grave threat, because even a mild case could prove fatal.  (Id. (noting that "'[s]everal studies have indicated that patients with active cancer die from COVID-19 at 'significantly higher rates' than those in the general population'" (quoting United States v. Lara, Case No.: 14-cr-215-5-GPC, 2021 WL 1839985, at *3 (S.D. Cal. May 7, 2021) (citation omitted))))

The Government concedes that Ramirez's "cancer diagnosis and the BOP's determination that [his] cancer is terminal, constitutes 'extraordinary and compelling' circumstances permitting his compassionate release."  (Govt. Opp. (Dkt. No. 454) at 22)

Accordingly, this Court finds that Ramirez's advanced pancreatic and liver cancer constitute "extraordinary and compelling reasons" for purposes of the compassionate release statute.  See United States v. Kelley, 464 F. Supp. 3d 1134, 1135 (N.D. Cal. 2020) (finding

---

[6] Section 1B1.13 also specifies that "[a] specific prognosis of life expectancy . . . is not required."  (Id.)

extraordinary and compelling reasons where defendant suffered from terminal prostate cancer with two-year life expectancy); United States v. Winckler, Criminal Action No. 13-318, 2020 WL 1666652, at *2 (W.D. Pa. Apr. 3, 2020) (finding extraordinary and compelling circumstances where defendant was diagnosed with "stage-four metastatic thyroid cancer" and had life expectancy of less than twelve months); United States v. Wong Chi Fai, 93-CR-1340 (RJD), 2019 WL 3428504, at *3 (E.D.N.Y. July 30, 2019) (finding extraordinary and compelling circumstances where defendant suffered from "metastatic papillary thyroid cancer" with twelve-month life expectancy).

### C.      Section 3553(a) Factors

As to the Section 3553(a) factors, Ramirez's offenses are extremely serious.  He was the leader of a violent narcotics trafficking organization for years.  He kidnapped and robbed others at gunpoint, ordered the murders of at least two victims, and committed numerous assaults.  He also committed many of these offenses while disguised as a police officer.

As to Ramirez's personal history and characteristics, he was sexually assaulted twice as a child – once by a stranger as he was walking home from school, and once by his older sister's boyfriend, who threatened to kill Ramirez's sister and her child if Ramirez told anyone about the assault.  (Def. Br. (Dkt. No. 452) at 33 (citing Ramirez Ltr., Def. Br. Ex. A (Dkt. No. 452-2)); PSR ¶ 265)  Ramirez contends that these experiences, along with bullying he experienced as a child, led him to a life of crime.  (Id. at 32-34 (citing Ramirez Ltr., Def. Br. Ex. A (Dkt. No. 452-2)))

Ramirez began stealing cars and selling crack cocaine when he was fifteen years old.  (Id. at 34-35)  He was also involved in several shootouts, for which he spent time in jail.  (Id. at 35)  By the late 1980s, Ramirez was stealing cars from drug dealers.  He served prison

time for acting as a getaway driver for a robbery in 1990.  After his release from prison, he continued stealing cars and began robbing drug dealers.  (Id.)  His involvement with the 165th Street Organization began in 1994, and culminated in the charges brought against him in the instant case.  (Id.)  At the time of Ramirez's sentencing, he had fourteen prior convictions for offenses committed between 1987 and 1996.  His offenses resulted in twenty criminal history points.  (PSR ¶¶ 215-47; Govt. Opp. (Dkt. No. 454) at 24)

While in prison, Ramirez has committed a number of disciplinary infractions, including several violations for fighting and possession of drugs.  (Govt. Opp. (Dkt. No. 454) at 24 (citing Disciplinary Record (Dkt. No. 454-2)))  Most of Ramirez's infractions took place more than ten years ago, however, and he has had no disciplinary violations in the last five years. (See Disciplinary Record (Dkt. No. 454-2))

In support of his compassionate release motion, Ramirez has submitted a number of letters from other inmates testifying to his support and mentorship of them in prison.  (Def. Br. (Dkt. No. 452) at 35-39 (citing Johnson Ltr., Def. Br. Ex. I (Dkt. No. 452-9)); Aguon Ltr., Def. Br. Ex. J (Dkt. No. 452-10)); Gray Ltr., Def. Br. Ex. K (Dkt. No. 452-11); Reed Ltr., Def. Br. Ex. L (Dkt. No. 452-12); Smith Ltr., Def. Br. Ex. M (Dkt. No. 452-13); Fahs Ltr., Def. Br. Ex. N (Dkt. No. 452-14); Henrikson Ltr., Def. Br. Ex. O (Dkt. No. 452-15); Hare Ltr., Def. Br. Ex. P (Dkt. No. 452-16))

Ramirez has earned his GED while in prison, and has completed "close to 1,000 hours of rehabilitative programming," worked in skilled trades, and has received "'good monthly work evaluations.'"  (Id. at 39 (quoting May 12, 2021 BOP Ltr., Def. Br. Ex. R (Dkt. No. 452-18))  Ramirez contends that his efforts demonstrate rehabilitation, noting that – given his life sentence – he had no expectation of ever being able to use his education and job skills outside

prison.  (Id. at 39)  Ramirez also states that he sought to "lead by example and show [his]

children that if [he] could [get his GED,] so could they."  (Ramirez Ltr., Def. Br. Ex. A (Dkt. No.

452-1) at 8)

        The Government argues that Ramirez's rehabilitation is "incomplete," because he

"has continued to incur disciplinary infractions at a steady clip in connection with his

imprisonment."  (Govt. Opp. (Dkt. No. 454) at 27)  As noted, however, Ramirez has committed

no disciplinary infractions in the last five years.

        The Government also argues that Ramirez has not fully accepted responsibility

for his crimes, noting that in a compassionate release motion submitted in early 2020, he

"continued to blame others for his own actions and for the necessary consequences of his

actions."  (Id.)  In connection with the current application, however, Ramirez has submitted a

letter in which he appears to express genuine remorse for his offenses and to accept

responsibility for his actions.  He states that he now "clearly see[s] and understand[s] why [his]

actions were wrong," and that he "want[s] [his] life to be remembered as one of redemption."

(Ramirez Ltr., Def. Br. Ex. A (Dkt. No. 452-1) at 8-9)

        Acknowledging that there is some evidence of rehabilitation and acceptance of

responsibility, these factors are not so extraordinary as to warrant relief.

        Ramirez also asserts that there is now an unwarranted disparity in the sentences

imposed on him and his co-defendants.  (Def. Br. (Dkt. No. 452) at 44)  This argument is not

persuasive.  As discussed above, Ramirez was sentenced to life plus 45 years' imprisonment, and

has served twenty-three years in prison to date.  His brother, Luis Ramirez, also received a life

sentence, which he is still serving.  (Judgment (Dkt. No. 225))  While co-defendant Shirley

Calcano was sentenced to 40 years' imprisonment, this Court resentenced her to time served in

January 2014, which amounted to approximately thirteen years' imprisonment.  (Id.; see also Order (Dkt. No. 366) (granting Calcano's motion for resentencing); Am. Judgment (Dkt. No. 367))  Calcano did not participate in any murders, however, and she was convicted at trial on only two counts, while Ramirez was convicted on eighteen counts.  (Dec. 7, 2000 Trial Tr. (Dkt. No. 444-25) at 10-17; Order (Dkt. No. 367) at 2-3)  Manuel Gonzalez received a sentence of 35 years' imprisonment, but this Court resentenced Gonzalez to time served in January 2021, which amounted to approximately 24 years and eight months' imprisonment.  (See Order (Dkt. No. 402) (granting Gonzalez's motion for resentencing); Sentencing Tr. (Dkt. No. 439) at 27; Am. Judgment (Dkt. No. 436))  Although Gonzalez pled guilty to committing two murders, he acted on Ramirez's orders and was only sixteen and seventeen years old when he committed the offenses of conviction.   (Sentencing Tr. (Dkt. No. 439) at 27)  The Court concludes that there is no unwarranted disparity in sentences.

Ramirez further argues that his release is warranted to protect him from the risks that the COVID-19 virus presents to his health.  (Def. Br. (Dkt. No. 452) at 41-43)  As the Government points out, however, Ramirez refused the COVID-19 vaccine in January 2021. (Govt. Opp. (Dkt. No. 454) at 22 n.8; see also Ramirez Medical Records as of Sept. 1, 2021 (submitted under seal) at 245)  Although Ramirez asserts that the COVID-19 virus would present a grave risk to his health "even if he ha[d] been vaccinated," he does not explain why he refused to take advantage of the protection the vaccine provides.  (Def. Br. (Dkt. No. 452) at 41-42) Given that Ramirez refused the vaccine, the risks presented by the COVID-19 virus do not weigh in favor of his release.

As to the need to protect the community, the Court finds that – in light of Ramirez's terminal illness, short life expectancy, and the condition of home confinement that the

Court intends to impose – his release does not pose a danger to the community.  See Pancreatic Cancer Prognosis, JOHNS HOPKINS MEDICINE,

https://www.hopkinsmedicine.org/health/conditions-and-diseases/pancreatic-cancer/pancreatic-cancer-prognosis (last visited Sept. 12, 2021) (the five-year survival rate for stage four pancreatic cancer is one percent, and the average patient lives for "about 1 year after diagnosis"); see also United States v. Perez Alvarado, Case Nos. 16-cr-00940-BAS, 16-cr-02770-BAS, 17-cr-07017-BAS, 2020 WL 5203386, at *2-3 (S.D. Cal. Sept. 1, 2020) (granting compassionate release where defendant was diagnosed with stage four colon cancer, which was "likely to be a terminal diagnosis," and which made recidivism "unlikely"); Winkler, 2020 WL 1666652, at *2-3 (finding that defendant's "age, cancer diagnosis and deteriorating physical condition make it unlikely that Defendant will reoffend" where defendant was 59 years old, had stage four thyroid cancer, and had life expectancy of less than a year).

Finally, the twenty-three years Ramirez has served in prison represents a substantial punishment.  Given his terminal diagnosis and deteriorating medical condition, further imprisonment is not necessary to serve the goals of deterrence and promoting respect for the law.  See United States v. Tidwell, 476 F. Supp. 3d 66, 68, 77 (E.D. Pa. 2020) (granting compassionate release where 62-year-defendant had stage four prostate cancer, life expectancy of less than twelve months, and had served twenty-five years of life sentence; finding that twenty-five years' imprisonment was "a very substantial punishment" and "a period of time that promotes respect for the law and provides just punishment"); Kelley, 464 F. Supp. 3d at 1135, 1137 (granting compassionate release where defendant served approximately half of 120-month sentence, was diagnosed with late-stage prostate cancer, and had two-year life expectancy); Winkler, 2020 WL 1666652, at *2-3 (granting compassionate release where defendant served

five years of 96-month sentence, was diagnosed with stage four thyroid cancer, and had life

expectancy of less than twelve months; finding that "requiring Defendant to serve the sentence

originally imposed would all but ensure he would die in custody . . . [and] would be inconsistent

with promoting respect for the law and human dignity"); United States v. Karr, No. 6:17-CR-25-

REW, 2020 WL 774363, at *5–6,  (E.D. Ky. Feb. 18, 2020) (granting compassionate release

where defendant had served two years of 108-month sentence, was diagnosed with stage four

lung cancer, and had life expectancy of less than twelve months; finding that there is "no

material risk of future criminality in a reduction based on a post-crime, terminal diagnosis");

Wong Chi Fai, 2019 WL 3428504, at *3 (granting compassionate release to defendant who was

convicted of participating in murders as leader of gang, and who had served twenty-six years of

life sentence, was diagnosed with terminal thyroid cancer, and had life expectancy of twelve

months).

             In sum, the Court finds that Ramirez's terminal pancreatic and liver cancer, and

short life expectancy, constitute "extraordinary and compelling reasons" that warrant his release,

and that these circumstances are not outweighed by the Section 3553(a) factors.  Accordingly,

Ramirez's motion will be granted.

             The terms and conditions of Ramirez's supervised release are amended as

follows:

1. the first twenty-four months of Ramirez's supervised release term will be served on home confinement, enforced by electronic monitoring, at a location approved by the U.S. Probation Office;

2. Ramirez is to self-quarantine at the location approved by the U.S. Probation Office for the first fourteen days of his supervised release;

3. during the period of his home confinement, Ramirez will remain at his approved location except to seek necessary medical care or to meet with his attorney, in each instance with prior notice and approval by the U.S. Probation Office; and

4.  in the event that the U.S. Probation Office is not able to implement electronic monitoring immediately upon Ramirez's release, in the interim Ramirez will be in daily contact with his U.S. Probation Officer, whether by videoconference or by telephone.

## **CONCLUSION**

For the reasons stated above, Defendant Ramirez's motion for compassionate release (Dkt. No. 451) is granted.

Dated: New York, New York
September 13, 2021

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge

19